O P I N I O N
Intervenor-Appellant Anna Coman appeals the decision of the Coshocton County Court of Common Pleas, Juvenile Division, which granted permanent custody of her grandchild, Corey Wright, to Appellee Coshocton County Children's Services Board ("CCCSB"). The relevant facts leading to this appeal are as follows.
On November 29, 1998, Renate Wright gave birth to Corey Wright. Renate is a citizen of Germany, and met Jason Wright, Corey's father, while he was stationed there in the military. They are presently divorced. Appellant Coman is Renate's mother, who lives in Nuremburg, Germany. She was sixty-nine years of age at the time of the evidentiary proceedingssub judice. The trial court provided a translator for her assistance during the proceedings.
Following the divorce, Renate resided in Coshocton and began raising Corey. However, shortly after Corey's birth, Renate began serving a nine-month sentence on a cocaine trafficking charge. Renate was able to obtain an appeal bond on her criminal conviction.
In April 1999, CCCSB investigated Corey's situation, resulting in the filing of a dependency and neglect complaint in the trial court on April 23, 1999. Following hearing on April 29, 1999, Corey was temporarily placed with his father, Jason Wright. However, on April 30, 1999, CCCSB moved the court for temporary placement of Corey in foster care.
On June 2, 1999, Jason Wright entered a written admission to dependency and neglect allegations. In the meantime, an adjudicatory hearing was set for May 19, 1999, and was then continued until June 23, 1999. At said hearing, the parties agreed to continue the matter until Renate's appeal from her criminal conviction was resolved.[1]
On October 27, 1999, the complaint regarding Corey was dismissed by CCCSB because of statutory time limits. However, on November 4, 1999, CCCSB filed a new complaint with essentially the same allegations as in the original. As a result of the complaint, custody of Corey was continued with CCCSB.
Appellant, who was delayed trying to resolve a matter involving her German pension, arrived in the United States in December 1999. On February 1, 2000, appellant filed a request for appointment of counsel, even though at this time she was not a party to the case. This request was denied on March 2, 2000. On May 2, 2000, by agreement of the parties, the trial court permitted intervention of appellant as a party and appointed counsel for her. On May 23, 2000 Jason agreed to a permanent surrender of his parental rights and obligations regarding Corey. On June 12, 2000, CCCSB filed a new complaint for permanent custody of Corey. On June 14, 2000, the parties agreed that Corey was neglected, and a disposition hearing was scheduled for June 15, 2000. The hearing proceeded on June 15, 2000 and continued through June 16, 2000. On June 28, 2000, the guardian ad litem's report was filed. A special hearing for cross-examination of the guardian ad litem took place on August 15, 2000.
On November 14, 2000, the trial court journalized a finding of neglect, per the parties' agreement of June 14, 2000. Shortly thereafter, on November 16, 2000, trial court issued its final decision granting permanent custody of Corey to CCCSB.
Appellant filed her notice of appeal on December 11, 2000, and herein raises the following two Assignments of Error:
 I. THE TRIAL COURT ABUSED ITS DISCRETION AND IGNORED STATUTORY GUIDELINES WHEN IT FAILED TO ORDER CHILDREN'S SERVICES TO EVALUATE THE MATERNAL GRANDMOTHER AS A POSSIBLE FAMILY PLACEMENT.
 II. THE TRIAL COURT FAILED TO CONSIDER THE BEST INTEREST OF THE CHILD WHEN IT REFUSED TO CONSIDER THE MATERNAL GRANDMOTHER AS A POSSIBLE PLACEMENT.
 I.
In her First Assignment of Error, appellant contends that the court ignored the statutory provisions of R.C. 2151.412(G) in failing to direct CCCSB to consider her as a possible placement. We disagree.
R.C. 2151.412(G) reads in pertinent part as follows:
 (G) In the agency's development of a case plan and the court's review of the case plan, the child's health and safety shall be the paramount concern. The agency and the court shall be guided by the following general priorities:
***
 (2) If both parents of the child have abandoned the child, have relinquished custody of the child, have become incapable of supporting or caring for the child even with reasonable assistance, or have a detrimental effect on the health, safety, and best interest of the child, the child should be placed in the legal custody of a suitable member of the child's extended family;
 (3) If a child described in division (G)(2) of this section has no suitable member of the child's extended family to accept legal custody, the child should be placed in the legal custody of a suitable nonrelative who shall be made a party to the proceedings after being given legal custody of the child;
***
 (5) If the child cannot be placed with either of the child's parents within a reasonable period of time or should not be placed with either, if no suitable member of the child's extended family or suitable nonrelative is available to accept legal custody of the child, and if the agency has a reasonable expectation of placing the child for adoption, the child should be committed to the permanent custody of the public children services agency or private child placing agency;
***
We have previously found the language of R.C. 2151.412(G) to be precatory, rather than mandatory. In Re Brandon Cundiff (Nov. 20, 1995), Stark App. No. 95-CA-00102, unreported, at 2, citing In Re Hiatt (1993),86 Ohio App.3d 716, 722. The transcript reveals that the caseworker, Leslie Dulgar, testified in part as follows, during cross-examination, regarding her initial efforts to inquire about relative placement possibilities for Corey:
 Q. Now, is it normally — if you have a situation where the parent from whom a child is being removed says, "I have a mother," or "I have a father," do they specifically have to request that that mother or father be looked at as a potential placement before you'll do that?
 A. They would have to give us information on the mom — like as far as like name, address, phone number so we can get things done there as far as that goes.
Q. Why didn't you ask for that information?
 A. That was — `cause I didn't know Renate very well. And she just said when I said, "Who can take this child, what relatives?" And she just said, "There are none in Ohio," is what she responded to me. And I didn't pursue it anymore as far as where else it could go.
 Q. So, once again, are you saying that it is the parent's responsibility to find a placement?
 A. No. But they know best of who's in their family and who would be able to take care of this child, as far as giving us names for us to look into it.
 Q. So you — so when you remove a child from a parent, because that parent for whatever reason is at that time not fit to care for the children, that parent is in the best position to determine who could best take care of the child?
 A. They will give us names, and then we will look into that relative's background and get information.
 Q. Did you at some point tell her, "Well, she's in Germany, and that won't work"? Did you tell her it wouldn't — you couldn't do it because her mother was in Germany?
 A. I do not — I cannot recall off the top of my head that I ever said, "Well, no, you can't have your mom." I remember her saying her mom was going to come over to the States. And I know her whole goal was to reunify with Renate particularly.
Q. Whose goal?
 A. Everyone's goal involved is to reunify the child with the mother.
Tr. at 213-215.
Dulgar further recalled that in May or June of 1999, Renate told her that appellant was planning to make a trip to Ohio from Germany later that summer. Tr. at 216. Dulgar explained her subsequent procedures as follows:
 A. I guess at that point Renate was following through with some of the things that we were asking her to do. We were trying to work with her on reunification. She mentioned she would be coming. We were going to wait until she got here, get, you know, that information at that point. Because that was — our whole goal was, you know, reunifying. Because Renate was following through with some things at that point, and just working with Renate as the mother. And Grandma never came in August, September. She didn't come until December.
Q. Right.
A. So that was why we didn't pursue that more.
Tr. at 221.
Appellant labels Dulgar's testimony as "patently unbelievable" and contends that it demonstrates an overall hostility towards consideration of appellant as a possible placement. Appellant's Brief at 11-12. Appellant also points out contradictory testimony by Renate, who recollected that Dulgar's response to Renate's suggestion of appellant for placement was merely "`[w]ell, she's not here.'" Tr. at 330. Nonetheless, as an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758, unreported. "Moreover, the knowledge the juvenile court gains at the adjudicatory hearing through viewing the witnesses and observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony cannot be conveyed to a reviewing court by a printed record." In reAwkal (1994), 95 Ohio App.3d 309, 316.
We are therefore unpersuaded that the trial court failed to ensure sufficient compliance with the guidance of R.C. 2151.412(G)[2] under the facts and circumstances presented.
Appellant's First Assignment of Error is overruled.
 II.
Appellant also contends the trial court's decision to grant CCCSB permanent custody did not serve the best interests of Corey, because appellant was not properly considered as a relative placement. We disagree.
The relevant statutory section of R.C. 2151.414, as written at the time of the case sub judice, mandates as follows:
 (D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
CCCSB directs our attention to the decision of the Ninth District Court of Appeals in In re Jefferson (Oct. 25, 2000), Summit App. Nos. 20092, 20110, unreported, which held in pertinent part as follows:
 Appellants' first argument is based on an incorrect legal premise that if a suitable relative was available, the court was required by statute to pursue placement with the relative before granting permanent custody to CSB. In fact, this Court has held that the trial court is not required to consider placement with a relative before granting permanent custody to CSB. In the Matter of Knight (Mar. 22, 2000), Lorain App. Nos. 98CA007258/98CA007266, unreported. The willingness of a relative to care for the child does not alter the statutory factors to be considered in granting permanent custody. Id., citing In the Matter of Mastin (Dec. 17, 1997), Lorain App. Nos. 97CA006743/97CA006746, unreported.
Id. at 2.
The trial court in the case sub judice, in its thorough findings and conclusions, applied the evidence presented, including that regarding appellant's situation, to the factors to be considered under R.C.2151.414(D). The court assessed appellant as a law-abiding citizen who cared very much for Corey. The court further noted that appellant attended all of the visitation sessions arranged by CCCSB, and that she appeared to be able to supply a place to care for Corey in her apartment in Germany. However, it is evident that the court carefully considered the concerns of the guardian ad litem regarding appellant's age, the undeveloped bond between appellant and Corey, and the destabilizing effect of removing a very young child from his foster family. While this case may have presented an unusual set of geographical circumstances, we are not persuaded that the trial court disregarded its paramount duty to protect the best interests of the child per the statutory framework. As we have recited on several occasions: "The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." In re Awkal, supra, at 316.
Appellant's Second Assignment of Error is overruled.
For the reasons stated in the foregoing opinion, the decision of the Court of Common Pleas, Juvenile Division, Coshocton County, Ohio, is hereby affirmed.
 _________________ Wise, J.
By: Hoffman, P. J., and Farmer, J., concur.
[1] This Court affirmed Renate's conviction in State v. Wright (Aug. 25, 1999), Coshocton App. No. 99CA3, unreported.
[2] CCCSB also argues, in response to appellant's position, that appellant waived her opportunity to raise issues regarding R.C.2151.412(G), due to her failure to object to the case plan. However, in light of our present holding, we find it unnecessary to address this argument.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas, Juvenile Division, Coshocton County, Ohio, is affirmed.
Pursuant to App.R. 24(A)(2), appellant shall pay costs in this matter.